2006 VT 91

## In re Stormwater NPDES Petition

[910 A.2d 824]

No. 04-515

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed August 25, 2006

*William H. Sorrell*, Attorney General, and *S. Mark Sciarrotta* and *Kevin O. Leske*, Assistant Attorneys General, Montpelier, for Appellant.

*R. Bradford Fawley*, *William J. Dodge*, and *Daniel P. Smith* of *Downs Rachlin Martin PLLC*, Burlington, for Appellants/Intervenors.

*Christopher M. Kilian*, Conservation Law Foundation, and *Mark E. Naud* and *Jamey Fidel*, Vermont Natural Resources Council, Montpelier, for Appellees.

*James W. Barlow*, Montpelier, for Amicus Curiae Vermont League of Cities and Towns.

*Bernard D. Lambek* of *Zalinger Cameron & Lambek, P.C.*, Montpelier, *Richard S. Davis* and *Karen M. Hansen* of *Beveridge & Diamond, P.C.* and *Thomas Ward*, National Association of Home Builders, Washington, D.C., for Amici Curiae National Association of Home Builders and Home Builders and Remodelers Association of Vermont.

*Thomas F. Heilmann* of *Heilmann, Ekman & Associates*, Burlington, for Amicus Curiae Vermont Association of Realtors.

*James Murphy*, Montpelier, and *Patrick A. Parenteau* and *Julia LeMense Huff*, Environmental and Natural Resources Law Clinic, South Royalton, for Amici Curiae Honorable Philip Henderson Hoff, Honorable George E. Little, Jr. and National Wildlife Federation.

¶ 1. **Reiber, C.J.** This appeal arises from a determination by the Vermont Water Resources Board that existing stormwater discharges into five brooks located within Chittenden County contribute to violations of Vermont Water Quality Standards, and therefore require federal discharge permits under the Clean Water Act, 33 U.S.C. §§ 1251-1387 (2000). Two separate appeals, one by a group of business organizations and the other by the Agency of Natural Resources, raise a variety of procedural issues relating to the Board's decision, as well as a direct challenge to its substantive ruling requiring the federal permits. We reject the procedural claims, but conclude that the Board erroneously encroached on the Agency's authority in assuming that the discharges contribute to violations of water quality standards, and therefore reverse the judgment and remand for additional proceedings before the Agency of Natural Resources.

¶ 2. To understand the facts and issues raised by this appeal, a summary of the regulatory backdrop is useful. Congress enacted the Clean Water Act (CWA or Act), to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). In furtherance of this goal, the CWA prohibits the discharge of any pollutants into navigable waters unless the discharge complies with other provisions of the Act, including § 402. *Id.* § 1342. Section 402 authorizes the issuance of National Pollutant Discharge Elimination System (NPDES) permits for the discharge of pollutants notwithstanding the general prohibition. Congress empowered the Environmental Protection Agency (EPA), or a state agency duly certified by EPA, to enforce the NPDES permit system. *Id.* § 1342(a), (b). In Vermont, that agency is the Agency of Natural Resources (Agency or ANR).

¶ 3. In 1987, Congress amended the CWA by enacting the Water Quality Act. That law added § 402(p), which codified a two-phase regulatory approach to the discharge of pollutants specifically contained in stormwater runoff. Under this section, in Phase I, Congress prohibited EPA or state agencies from requiring NPDES permits for "discharges composed entirely of stormwater" until October 1994, with four exceptions: (1) discharges subject to an existing permit; (2) discharges associated with industrial activity; (3) discharges from an MS4 — a "municipal storm sewer system" — serving a population of 250,000 or more; and (4) discharges from an MS4 for a municipality with a population greater than 100,000 but less than 250,000. 33 U.S.C. § 1342(p)(2)(A)-(D). Section 402(p)(2) also vested EPA or the duly authorized state agency with "residual authority" to designate any

other discharge as requiring a NPDES permit if it "contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." *Id.* § 1342(p)(2)(E).

¶ 4. Under the Water Quality Act, Congress required discharge permits for all so-called Phase I discharges, established a timetable for EPA to promulgate implementing regulations, and required EPA to study those discharges not identified as requiring a permit in Phase I and to issue new regulations based on the results of that study. *Id.* § 1342(p)(3)-(6). In 1990, EPA promulgated the so-called Phase I Rules. *National Pollutant Discharge Elimination System Permit Application Regulation for Storm Water Discharges*, 55 Fed. Reg. 47,990 (Nov. 16, 1990) (codified at 40 C.F.R. pts. 122-24). In December 1999, after completing the required study, EPA issued the so-called Phase II Rules. *National Pollutant Discharge Elimination System: Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges*, 64 Fed. Reg. 68,722 (Dec. 8, 1999) (codified at 40 C.F.R. pts. 9, 122, 123 & 124). In addition to those discharges previously identified in Phase I, the Phase II Rules required NPDES permits for stormwater discharges from small municipal sewer systems and from construction activity disturbing between one and five acres. 40 C.F.R. § 122.26(a)(9)(i)(A)-(B) (2005).

¶ 5. Notably, the Phase II Rules also retained the residual designation authority of EPA and certified state agencies to require NPDES permits for any additional sources of stormwater pollution if they contribute to a violation of a water quality standard. *Id.* § 122.26(a)(9)(i)(D); see also 33 U.S.C. § 1342(p)(2)(E) (authorizing a NPDES permitting authority to designate for regulation "[a] discharge for which the Administrator or the State, as the case may be, determines that the stormwater discharge contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States."). Indeed, the Phase II Rules not only preserved, but expanded the scope of the residual designation authority to include a "category of discharges within a geographic area" that contributes to the violation of a water quality standard or is a significant contributor of pollutants. 40 C.F.R. § 122.26(a)(9)(i)(D).

¶ 6. This case arose in June 2003, when the Conservation Law Foundation, later joined by the Vermont Natural Resources Council (hereafter jointly CLF), filed a petition with ANR seeking a determination that existing stormwater discharges into Potash, Englesby, Morehouse, Centennial, and Bartlett Brooks contribute to violations of

the Vermont Water Quality Standards and therefore require NPDES permits under the CWA. The petition was filed pursuant to a provision of the federal stormwater regulations authorizing "[a]ny person [to] petition the Director to require a NPDES permit for a discharge which is composed entirely of storm water which contributes to a violation of a water quality standard or is a significant contributor of pollutants to waters of the United States." 40 C.F.R. § 122.26(f)(2). The petition was premised on findings by the Board in two earlier decisions involving state discharge permits that the five brooks in question did not meet Vermont Water Quality Standards; that the brooks were therefore listed on the federally mandated schedule of "impaired waters," known as the 303(d) list, 33 U.S.C. § 1313(d); and that existing discharges within the five watersheds contribute to the impairments.

¶ 7. In response to the petition, ANR sought guidance from EPA on the nature and scope of its residual designation authority. EPA, in response, advised that stormwater discharges, categorical or otherwise, must be evaluated on a "case-by-case basis" and that a permit "must be denied if the discharge would cause or contribute to a violation of water quality standards," but that otherwise "an agency should act reasonably in its exercise of discretion to designate (or not) sources based on available information and relevant considerations." EPA noted further that it had "not defined a threshold level of pollutant contribution" that would require a NPDES permit, but observed that discharges which contribute more than "de minimis" levels of pollutants would be a "reasonable" standard.

¶ 8. In September 2003, the Agency sent a letter to CLF — together with a copy of EPA's responsive memorandum — categorically denying the petition. The Agency indicated that it rejected CLF's claim that all existing stormwater discharges to impaired waters "irrespective of their size or character, or existing stormwater management practices require an NPDES permit solely because they contribute a measurable or detect[a]ble quantity of the pollutant causing the impairment." CLF appealed the Agency's denial to the Board under 10 V.S.A. § 1269 ("Any person or party . . . aggrieved by an act or decision of [ANR] . . . may appeal to the board within thirty days."). Pomerleau Properties, Inc., Martin's Foods of South Burlington, Inc., and Greater Burlington

Industrial Corp. (herafter "appellants"), together with ANR, were granted party status in the proceeding.[1]

¶ 9. In April 2004, the Board issued an initial memorandum of decision resolving a variety of preliminary issues, including appellants' claim that the petition constituted a request for rulemaking over which the Board lacked jurisdiction. The Board rejected this and other procedural objections to its authority, and outlined the remaining issues to be resolved on appeal. These included the core issue of "whether all stormwater discharges into stormwater-impaired waters require NPDES permits, ipso facto, as [CLF] contend[s]" or whether, as ANR claimed, the decision "may involve other factors, such as the authority of Vermont to issue and enforce state stormwater permits." Following additional briefing, the Board issued a second memorandum of decision in October 2004, rejecting appellants' additional procedural claim that the appeal had been rendered moot by intervening amendments to the state's separate stormwater management program, known as Act 140, 10 V.S.A. §§ 1264, 1264a-1264c, and further concluding that its decisions in two earlier cases had conclusively established that every discharge of stormwater pollutants into the five brooks in question contributes to violations of the Vermont Water Quality Standards. Accordingly, the Board reversed the Agency's decision denying the petition, but remanded to the Agency for a determination whether any "de minimis exemption" to the requirement for discharge permits would be appropriate. These separate appeals by appellants and ANR followed.

## I.

¶ 10. Appellants and ANR raise a number of threshold issues relating to the Board's authority to address the petition in the first instance. The Agency claims that CLF's petition was not authorized under the pertinent federal regulations. It relies on the citizen-petition provision of the federal rules, which provides: "Any person may petition the Director [ANR] to require a NPDES permit for *a discharge* which is composed entirely of storm water which contributes to a violation of a water quality standard or is a significant contributor of pollutants to

---

[1] Under recent, comprehensive amendments to Vermont's land use and environmental protection laws, Agency decisions granting or denying NPDES permits are now appealable to the environmental court. 2003, No. 115 (Adj. Sess.), § 29.

waters of the United States." 40 C.F.R. § 122.26(f)(2) (emphasis added). ANR claims that the emphasized language limits citizen petitions to single discharges. Therefore, it asserts that CLF's request to determine that permits were required for an entire class of existing discharges within the enumerated watersheds was overbroad and outside the permissible scope of the regulations.

¶ 11. The Board was not persuaded by the argument, nor are we. As the Board noted, the initial Phase I stormwater regulations clothed the Agency with residual designation authority to require a permit when it determined that "[a] discharge" contributes to a violation of a water quality standard. *Id.* § 122.26(a)(1)(v). As part of its Phase II Rules, however, the EPA augmented the permitting agency's authority to require a permit when it "determines that the discharge, or category of discharges within a geographic area," contributes to a violation. *Id.* § 122.26(a)(9)(i)(D). The Board reasoned that it would not be logical to authorize permits for "categories" of stormwater discharges within a general geographic area, yet limit the petition process to single discharges.

¶ 12. We agree. Whatever the limits of Phase I's regulatory reach, the Phase II Rules plainly expanded ANR's authority to issue permits on a significantly broader basis, for wholesale categories of discharges in a geographic area. EPA's explanatory note to the proposed Phase II changes stated that the new regulations would allow the permitting authority to determine the necessity of a discharge permit "on a watershed or class basis where the permitting authority determines there is a significant impact or contribution." *Amendment to Requirements for National Pollutant Discharge Elimination System (NPDES) Permits for Storm Water Discharges Under Section 402(p)(6) of the Clean Water Act*, 60 Fed. Reg. 17,950, 17,953 (April 7, 1995) (codified at 40 C.F.R. pts. 122, 124 (2005)). EPA's explanatory notes to the Phase II Final Rules were the same, observing that the new regulations would allow discharge-permit determinations "on a case-by-case basis (or on a categorical basis within identified geographic areas such as a State or watershed) that regulatory controls are needed to protect water quality." *National Pollutant Discharge Elimination System: Regulations for Revision of the Water Pollution Control Program Addressing Storm Water Discharges: Final Rule*, 64 Fed. Reg. 68,721, 68,736 (Dec. 8, 1999) (codified at 40 C.F.R. pts. 9, 122, 123, 124). EPA explained that the broader permitting authority would "facilitate and promote" the overarching goal of coordinated "watershed planning": "In promoting the watershed approach to program

administration, EPA believes NPDES general permits can cover a category of dischargers within a defined geographic area. Areas can be defined very broadly to include political boundaries (e.g., county), watershed boundaries, or State or Tribal land." *Id.* at 68,739.

¶ 13. Thus, while ANR may believe that the "multi-prong" analysis necessary to determine the propriety of NPDES stormwater permits lends itself to a single, case-by-case approach, the federal regulations nevertheless plainly authorize a more categorical approach within a broad geographic setting. See *Envtl. Def. Ctr., Inc. v. EPA,* 344 F.3d 832, 869 (9th Cir. 2003) ("We treat EPA's decision with great deference" because of its expertise in the area).[2] Nothing in the regulations, moreover, would appear to bar a "category" consisting of existing discharges within a watershed not covered by the more specific provisions of the Phase I and II Rules relating to industrial activity, construction sites, and municipal sewer systems. See *Christman v. Davis,* 2005 VT 119, ¶ 10, 179 Vt. 99, 889 A.2d 746 (we assume drafters' intent was to accord plain, ordinary meaning to statutory terms); see also Webster's Third New Int'l Dictionary 352 (2002) (broadly defining category as "a class, group, or classification of any kind"). Indeed, the CLF petition would appear to be consistent with EPA's stated purpose of broadening the Agency's scope of authority to promote the goal of "watershed planning."

■ ¶ 14. Although the Phase II Rules failed to amend the original citizen-petition provision, which continues to refer to "a discharge," 40 C.F.R. § 122.26(f)(2), we are not persuaded that the omission was intended to preclude petitions addressed to a category of discharges in a watershed or other geographic area. First, we note the general interpretive rule set forth in 1 U.S.C. § 1, which provides that "[i]n

---

[2] Although the parties dispute whether deference is due to the Board's or the Agency's rulings, we defer to neither in construing federal law and regulations. *Jacobus v. Dep't of PATH,* 2004 VT 70, ¶ 23, 177 Vt. 496, 857 A.2d 785 (mem.). *MCI Telecomms. Corp. v. Dep't of Telecomms. & Energy,* on which ANR relies, held that it was appropriate to defer to a state agency's discretionary ruling on payphone rates under regulations promulgated by the Federal Communications Commission where the FCC had specifically determined that the decision "was best left to State regulatory authorities." 755 N.E.2d 730, 736 (Mass. 2001). As the certified NPDES permitting authority, ANR's discretionary ruling on whether to grant or deny a permit might thus be entitled to deference, but that deference does not extend to interpretations of the scope and purpose of provisions of the CWA and implementing EPA regulations.

determining the meaning of any Act of Congress, unless the context indicates otherwise — words importing the singular include and apply to several persons, parties, or things." See *Envtl. Def. Ctr.*, 344 F.3d at 874 n.63 (rejecting claim that EPA lacked authority to designate a "category" of discharges where the residual designation authority conferred by the CWA in § 402(p)(2)(E) referred only to "a discharge" in the singular, observing that the CWA tended to "refer to 'discharge' in the singular, even in reference to discharges clearly intended for categorical regulation," and relying on the interpretive rule set forth in 1 U.S.C. § 1). Moreover, nothing in the regulations or the EPA's explanatory notes suggests a purpose to limit citizen petitions to individual discharges, or to place categorical or regional stormwater planning in the exclusive regulatory domain of ANR, to be considered solely on its own initiative. In the absence of any such evidence, we agree with the Board's conclusion that a citizen's prerogative to request a permit under the regulations is as broad as the Agency's authority to grant one. See *T. Copeland & Sons, Inc. v. Kansa Gen. Ins. Co.*, 171 Vt. 189, 193, 762 A.2d 471, 473 (2000) (separate provisions that are part of an overall statutory scheme should be read and construed together).

¶ 15. The Agency also claims that even if the petition was properly before it, the Board lacked authority to issue a decision without first conducting a de novo evidentiary hearing, as required by 10 V.S.A. § 1269 (persons aggrieved by decision of the secretary may appeal to the Board, which "shall hold a de novo hearing"). By authorizing a de novo hearing, the statute plainly empowers the Board "to compel testimony and evidence by subpoena, examine witnesses and issue written findings." *In re Danforth*, 174 Vt. 231, 238, 812 A.2d 845, 851 (2002). Here, however, the Board — through a series of preliminary conferences and decisions — had narrowed the issues to be decided on the merits to a set of core legal questions, the principal being whether, as CLF contended, all stormwater discharges into impaired waters contribute to water quality violations and therefore require NPDES permits, or whether, as ANR claimed, such permits had been rendered largely superfluous through state regulation. The Board's ultimate decision in favor of CLF turned almost exclusively on its reading of federal regulatory requirements, rather than contested evidentiary issues. Accordingly, any technical failure to comply with the de-novo-hearing requirement was immaterial to the decision, and resulted in no

actual prejudice to appellants or denial of due process. Therefore, we discern no procedural error warranting reversal of the judgment.[3]

¶ 16. Appellants further assert that the Agency's decision was, in effect, a discretionary denial of a request for "rulemaking" beyond the Board's jurisdiction. In rejecting the claim, the Board acknowledged that its review authority is limited to "an act or decision" of the Agency, 10 V.S.A. § 1269, which it has construed as requiring a "contested case" within the meaning of the Administrative Procedure Act, 3 V.S.A. § 801(b)(2), as distinct from a "rulemaking proceeding" under the APA. See Water Resources Board Rules of Procedure 2.A(4)(a) (defining "contested case" as a "proceeding in which the legal rights, duties, or privileges of a party are required by law to be determined by the Board after an opportunity for a hearing in accordance with" the APA); 3 V.S.A. § 801(b)(9) (defining "rule" as an "agency statement of general applicability which implements, interprets, or prescribes law or policy and which has been adopted in the manner provided" by the APA). The Board concluded that the CLF petition was not — either by design or effect — a request for the Agency to promulgate policy, but rather a call for the Agency to exercise existing statutory and regulatory authority to require permits for a class of stormwater discharges within a number of impaired watersheds. Accordingly, the Board rejected appellants' claim that the petition was a request for rulemaking outside its jurisdiction.

¶ 17. Again, we agree with the Board's ruling. "An agency is not required to adopt rules or regulations to carry out what its authorizing statute specifically directs it to do." *In re Woodford Packers, Inc.*, 2003 VT 60, ¶ 13, 175 Vt. 579, 830 A.2d 100 (mem.); see also *State v. Wuerslin*, 174 Vt. 570, 571, 816 A.2d 445, 447 (2002) (mem.) (holding that Department of Liquor Control was not required to adopt interpretive rules or guidelines to implement its general enforcement authority). In its briefing to this Court, the Agency readily acknowledged that "[u]nder the states' 'residual designation authority' a NPDES permit is *required* where the delegated state agency, here ANR, 'determines

---

[3] As discussed in more detail in Part II, the Board's legal conclusion was grounded on the assumption, derived from earlier Board rulings, that stormwater discharges in the affected watersheds "contribute" to water quality violations. As we explain, that assumption was unwarranted. Resolution of the issue requires the consideration of factors within the Agency's discretion examined in light of information in its area of expertise to determine whether NPDES permits are actually required.

that the storm water discharge contributes to a violation of a water quality standard'" (quoting 33 U.S.C. § 1342(p)(2) (emphasis added)). See also 40 C.F.R. § 122.26(a)(9)(i)(D) (operators of stormwater discharges that contribute to a violation of water quality standards "*shall* be required to obtain a . . . permit") (emphasis added). Furthermore, while EPA, in response to ANR's request for advice, acknowledged the Agency's broad residual-designation authority, it also underscored its expectation that ANR "would reasonably exercise the authority to designate additional sources as necessary to protect water quality . . . based on available information and relevant considerations."

¶ 18. We are not persuaded, therefore, that the CLF petition requested or required ANR to "prescribe" a new rule or policy that was "not otherwise expressly provided by or clearly . . . inferable from the enabling statutory authorization." *In re Diel*, 158 Vt. 549, 555 n.*, 614 A.2d 1223, 1227 n.* (1992). The Agency's authority and responsibility to designate stormwaters that contribute to water quality violations was well-established and enforceable prior to the CLF petition. Nor are we persuaded by appellants' claim that the potential breadth of the petition, standing alone, transforms it into a request for rulemaking. As we have seen, ANR is expressly authorized to consider discharges on a categorical basis within broad geographic areas, and the Board's authority to review the granting or denial of discharge permits is necessarily coextensive with that authority. See 10 V.S.A. § 1269 (Board shall hear appeals and issue orders affirming, reversing, or modifying any "act or decision" of the secretary). Accordingly, we discern no merit to the claim that the Board lacked jurisdiction.

¶ 19. Appellants and ANR next focus on Vermont's separate stormwater management program. Appellants assert that recent comprehensive amendments to the state program, known as Act 140, render the CLF petition moot. The amendments, adopted in 2004, essentially require ANR to formulate cleanup plans within three years for the stormwater-impaired waters on the State's 303(d) list (including the five watersheds at issue here), 10 V.S.A. § 1264(f)(3), and to establish an interim permitting program for discharges from new, expanded, or redeveloped impervious surfaces in excess of one acre in order to achieve a "net zero" discharge goal. *Id.* § 1264a(b)(1). Appellants claim that Act 140 evinced a legislative intent to subject existing stormwater discharges such as those at issue here to state regulation, rather than to the NPDES permitting regime under the residual designation authority of the CWA.

■ ¶ 20. The Board properly rejected this claim. While observing that Act 140 represents a substantial commitment to addressing the problem of stormwater discharges in Vermont, the Board correctly concluded that the legislative goal was plainly to establish a state stormwater permitting program to supplement the federal NPDES program, not to supplant it. See 10 V.S.A. § 1264(a) (defining ANR's responsibility to "implement two stormwater permitting programs," the NPDES permit program and a state program to govern "regulated stormwater runoff"). Nothing in the state stormwater law evinces an intent to supersede ANR's residual designation authority to require a federal permit when it determines that an existing discharge contributes to a water quality violation.[4]

■ ¶ 21. While disavowing any claim that Act 140 "supplants" its federal residual designation authority, ANR advances the related argument that Act 140's cleanup and remedial programs are nevertheless relevant to its decision whether federal permits may be required for existing discharges in the watersheds in question. The Board rejected the argument to the extent that it was premised on the same theory advanced by appellants, to wit, that ANR may virtually decline to exercise its residual designation authority based on "state policy preferences" allegedly set forth in Act 140. As noted, we agree with the Board's conclusion that "[r]esidual designation [authority] is not optional." We agree with ANR, however, to the extent that its argument is limited to the principle that it may consider cleanup efforts under Act 140 in determining whether existing stormwater discharges contribute to water quality violations within the streams in question. As noted, EPA has advised — with the CLF petition expressly in mind — that the Agency enjoys broad discretion in the exercise of its residual designation authority "based on available information and relevant considerations." Thus, in ANR's determination of whether stormwaters "contribute to a water quality violation" under the CWA, we find

---

[4] In its explanatory comments to the Phase II Final Rules, EPA noted that it had considered and rejected suggestions from several state representatives that it approve "an approach whereby States develop an *alternative* program that EPA would approve or disapprove based on identified criteria." 60 Fed. Reg. at 68,740, 68,741 (emphasis added). EPA emphasized, however, that it remained committed to encouraging state "flexibility" and the avoidance of "duplication" between state and federal programs, and to this end stressed that the NPDES permit may be developed "in coordination with state standards." *Id.* at 68,740.

nothing in the federal scheme or regulations that would exclude from the category of "relevant considerations" any stormwater evaluation and control standards, state permits, remediation efforts, or other conditions established under Act 140 within the relevant watersheds, to the extent that they affect the level of stormwater pollutant discharges. As noted earlier, however, neither federal nor state law contemplates that Act 140 will serve as a substitute for the exercise of residual designation authority under the CWA.[5]

## II.

¶ 22. Our conclusion in this regard anticipates the broader question, and the core substantive issue of this appeal, relating to the Board's ruling that — subject to any "de minimis" exception identified by ANR — existing stormwater discharges into the five streams in question require federal NPDES discharge permits. The Board's ruling was grounded on the critical assumption that existing discharges "contribute to a violation of a water quality standard" within the meaning of the federal regulations. 40 C.F.R. § 122.26(a)(1)(v). This assumption was based, in turn, on two earlier Board decisions that collectively concerned the same impaired streams, *In re Hannaford Bros. Co. & Lowes Home Centers, Inc.*, No. WQ-01-01 (Water Resources Board Order, Jan. 18, 2002), and *In re Morehouse Brook, Englesby Brook, Centennial Brook, & Bartlett Brook*, No. WQ-02-04 (Water Resources Board Order, June 2, 2003). The Board characterized these decisions as conclusively holding, for purposes of federal law, "that every discharge of stormwater pollutants into these stormwater-impaired urbanized waters contributes to the impairment" and therefore requires a NPDES permit, subject to any "de minimis" exemption established by ANR on remand.

¶ 23. The parties here agree that the Board implicitly applied the doctrine of collateral estoppel in concluding that the issue of whether existing discharges contributed to water quality violations under federal law had been conclusively determined in the *Hannaford*

---

[5] As noted in footnote 4, *supra*, this approach is fully consistent with EPA's recognition that NPDES permits may be developed "in coordination with State standards." *Regulations for Revision of the Water Pollution Control Program Addressing Stormwater Discharges*, 64 Fed. Reg. at 68,740. Contrary to ANR's assertion, we do not read the Board decision as precluding it from considering any state-imposed clean-up plans or remedial efforts in applying its residual designation authority, nor, as noted, would such a limitation be consistent with the federal rules.

and *Morehouse Brook* decisions. They emphatically disagree, however, on whether the Board was correct in doing so. The doctrine of collateral estoppel, or issue preclusion, bars relitigation of an issue actually litigated by the parties in a prior case, and applies when: (1) it is asserted against one who was a party in the prior action; (2) the same issue was raised in the prior action; (3) the issue was resolved by a final judgment on the merits; (4) there was a full and fair opportunity to litigate the issue in the prior action; and (5) its application is fair. *Trickett v. Ochs*, 2003 VT 91, ¶ 10, 176 Vt. 89, 838 A.2d 66. We have recognized that collateral estoppel may apply in administrative as well as judicial proceedings if the elements are satisfied. *In re Central Vt. Pub. Serv. Corp.*, 172 Vt. 14, 21, 769 A.2d 668, 674 (2001).

¶ 24. We conclude that the Board erred in applying the collateral estoppel doctrine for the simple reason that the issue is not the same as that raised in the earlier decisions on which it relied. *Hannaford* concerned an application for a discharge permit for a proposed development under the state's stormwater management program. In resolving that issue, the Board found that every discharge of stormwater that increases the mass loading of pollutants into impaired streams "contributes to the existing impairment." *Hannaford*, No. WQ-01-01, at 12. In an earlier ruling in the same case, however, the Board made clear that federal permitting requirements were not at issue, stating explicitly that it "declines to decide whether and under what circumstances the permit complies with the federal NPDES permitting program." *In re Hannaford Bros. & Lowes Homes Centers, Inc.*, No. WQ-01-01 (Water Resources Board Order, June 29, 2001), at 14.

¶ 25. Similarly, in *Morehouse Brook*, the Board considered the propriety of ANR's issuance of four watershed improvement permits under the state's pre-Act 140 stormwater management program. The Board invalidated the permits in part because they failed to ensure that new or increased stormwater discharges could be assimilated into the impaired waters without increasing their pollutant loads. *Morehouse Brook*, No. WQ-02-04, at 29. Again, however, the Board expressly declined to address whether the discharges "comply with federal law." *Id.* at 30.

¶ 26. Thus, in the context of construing and applying the state's stormwater management program, the Board in *Hannaford* and *Morehouse Brook* made factual findings that existing stormwater discharges to impaired streams necessarily contribute to the existing impairments. The issue here, while superficially similar, is quite

distinct. The question before the Board in this case was whether, under the federal NPDES permitting program, the Agency was compelled to exercise its residual designation authority to require federal discharge permits. Resolution of this issue, which the Board was careful to avoid in both earlier decisions, involves a particularized, fact-specific determination on a case-by-case basis as to whether certain discharges or categories of discharges "contribute[] to a violation of a water quality standard." 40 C.F.R. § 122.26(a)(9)(i)(D). It is manifestly not a decision that can be grounded on a single factual finding, in a separate legal setting, that all existing stormwater discharges contribute to the impairment of impaired waters.

¶ 27. That the NPDES permitting issue under federal law requires a particularized, fact-specific analysis is readily apparent from the regulatory record. In its comments to the Phase II Final Rules, EPA explained that the residual designation authority had not only been retained, but expanded, for the very purpose of affording permitting agencies the flexibility to address local discharges that do not fit "neatly" within general categories in order to facilitate effective local planning:

> Under today's rule, EPA and authorized States continue to exercise the authority to designate remaining unregulated discharges composed entirely of storm water for regulation on a case-by-case basis. . . . EPA believes, as Congress did in drafting [§] 402(p)(2)(E), that individual instances of storm water discharge might warrant special regulatory attention, but do not fall neatly into a discrete, predetermined category. Today's rule preserves the regulatory authority to subsequently address a source (or category of sources) of storm water discharges of concern on a localized or regional basis.

*Regulations for Revision of the Water Pollution Control Program Addressing Stormwater Discharge*, 64 Fed. Reg. at 68,781. In rejecting a claim that EPA's broadly defined residual designation authority exceeded the scope of the CWA, a federal appeals court also emphasized the contextualized nature of the residual designation authority: "EPA reasonably determined that, although it lacked sufficient data to support nationwide, categorical designation of these [nonspecific] sources, particularized data might support their designations on a more localized basis." *Envtl. Def. Ctr.*, 344 F.3d at 875-76.

¶ 28. Thus, while the Agency's residual designation authority is not optional, its discretion in exercising that authority is broad and

necessarily focused on particular local and regional conditions, including, as noted, any stormwater-discharge data at its disposal and local or regional remedial efforts. The Agency may not — consistent with this approach — be confined to a single factual finding, in a separate legal context, that existing stormwater discharges contribute to the impairment of the impaired streams at issue. Indeed, in responding to ANR's inquiry, EPA made it clear that it "does not interpret the regulations to require designation (for NPDES permits) of every storm water discharge to an impaired water with a measurable and detectable amount of the pollutant causing the impairment," nor, indeed, had it even "defined a threshold level of pollutant contribution that would trigger" a federal permit requirement.[6] Plainly, whether a stormwater discharge "contributes" to a violation of water quality standards under federal law is a distinct, multi-layered issue that was neither considered nor resolved in the Board's earlier decisions.

■ ¶ 29. We conclude, therefore, that the Board erred in relying on its earlier decisions to reverse the Agency's ruling. It is equally apparent, however, that the Agency erred in summarily denying the petition rather than undertaking the requisite fact-specific analysis under its residual designation authority to determine whether NPDES permits were necessary for the discharges in question. Accordingly, we hold that the Board's decision must be reversed, and the matter remanded for further consideration in light of the views expressed herein.

¶ 30. We further conclude that the matter should be remanded to the Agency, rather than the Board, to undertake the requisite analysis. We recognize that the Board's review on appeal from Agency decisions is de novo, 10 V.S.A. § 1269, but we believe that it is appropriate — in view of the Agency's particular expertise and experience in the area of stormwater permits — to afford it the opportunity to address these issues in the first instance. We recognize, as well, that recent comprehensive amendments to Vermont's land use and environmental laws have repealed the Board's former jurisdiction over such matters, but note that the legislation in question contained "transition" provisions to allow the Board to complete its consideration of any action still pending before it as of January 31, 2005. 2003, No. 115 (Adj. Sess.), § 121.

---

[6] While the "de minimis" standard was mentioned by EPA as one that the Agency could "reasonably" adopt, it was not advanced as an exclusive standard.

*The decision of the Water Resources Board is reversed, and the case is remanded to the Agency of Natural Resources with directions to reconsider the petition consistent with the views expressed herein.*