STATE OF VERMONT

| SUPERIOR COURT | ENVIRONMENTAL DIVISION |
| Environmental Division Unit | Docket No. 97-9-18 Vtec |

| | |
|---|---|
| Randolph Village Water System | DECISION ON MOTIONS |

The present action is an appeal of "Public Community Water System Permit to Operate," permit # 5179-18.0 (the Permit), issued by the Agency of Natural Resources (ANR) to the Town of Randolph (Town) to operate its water system. In relevant part, the Permit imposed a condition requiring the system to contain manganese concentrations of less than 0.3 milligrams per liter (mg/L), to be measured at the entry point to the distribution system. The Town timely appealed the Permit to this Court challenging the manganese condition. Presently before the Court are the parties' cross-motions for summary judgment.

The Town is represented in this matter by Paul Gillies, Esq., and Nicholas Low, Esq. ANR is represented by Diane Sherman, Esq.

**Legal Standard**

The Court will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." V.R.C.P. 56(a), applicable here through V.R.E.C.P. 5(a)(2). When presented with cross-motions for summary judgment, we consider each motion individually and give the opposing party the benefit of all reasonable doubts and inferences. City of Burlington v. Fairpoint Commc'ns, Inc., 2009 VT 59, ¶ 5, 186 Vt. 332.

**Factual Background**

We recite the following factual findings solely for the purpose of deciding the pending motions.

1.      The Town owns and operates the Randolph Village Water System (the Water System).

2.      The Water System is a public water system that is subject to the Vermont Water Supply Rule (VWSR).

3.      Five wells supply the Water System: four Pinnacle Wells located west of Route 12, and the Pearl Street Well, located in the Village area.  Storage is provided by both the North and South Reservoirs, which provide 1.5 million gallons and 1.0 million gallons of storage respectively.

4.      Both the federal regulations and the VWSR set a manganese secondary standard at 0.05 mg/L.  See 40 C.F.R. § 143.3; VWSR Table 6-2.

5.      The federal regulations define the 0.05 mg/L manganese secondary standard in terms of the end-user.

6.      There is no primary standard for manganese in either federal law or the VWSR.

7.      The Vermont Department of Health (VDH) has issued a manganese drinking water health advisory level of 0.3 mg/L.

8.      On August 9, 2018, ANR issued the Permit to the Town to operate the Water System pursuant to 10 V.S.A. Chapter 56 and the VWSR.

9.      The Permit requires the Town to meet a manganese concentration of less than 0.3 mg/L to be measured at the distribution entry point.

10.      ANR asserts that contaminant monitoring is typically done at this location.

11.      Samples collected at the distribution entry point for the Pearl Street Treatment Facility indicate that the water coming from the Pearl Street Well currently contains manganese concentrations greater than 0.3 mg/L.

12.      The Town timely appealed the Permit to this Court.

## Legal Framework

The Permit was issued pursuant 10 V.S.A. Chapter 56, governing public water supplies in Vermont, and the VWSR.  The stated purpose of the VWSR "is to protect the public health by assuring safe, affordable drinking water from Public and Non-Public water systems, and to implement and enforce the provisions of the Federal Safe Drinking Water Act and Vermont Statutes."  VWSR § 1.2.

Further, the VWSR both refers to and adopts the authority of the Federal Safe Drinking Water Act (SDWA).  Id. § 1.1; see also 42 U.S.C. 300 f. *et. seq.*  It further adopts and incorporates by reference the National Primary Drinking Water Regulations, 40 C.F.R. § 141, and the National Secondary Drinking Water Regulations, 40 C.F.R. § 143.  Id.  This was done through an agreement

2

with the United States Environmental Protection Agency (EPA) and results in the State of Vermont having primary enforcement authority in Vermont for the Safe Drinking Water Act. Id.

Accordingly, both the SDWA and the VWSR have "primary" and "secondary" drinking water standards. The VWSR defines a "primary drinking water standard" as a standard which "applies to contaminants which may have an adverse effect on the health of persons" and sets maximum contaminant levels (MCLs) or treatment techniques to manage contaminants. VWSR § 2.2.

This definition is highly similar to the definition of a "primary drinking water regulation" set forth in the SDWA. 42 U.S.C. § 300f(1)(A)—(D).

The VWSR defines a "secondary drinking water standard" as setting the MCLs which, in the judgment of the Secretary of ANR, are necessary to protect the public welfare. VWSR § 2.2. These standards apply to contaminants in drinking water that may "(a) adversely affect the odor or appearance of such water and consequently may cause a substantial number of persons served by the Public water system providing such water to discontinue its use, or (b) otherwise adversely affect the public welfare." Id. Secondary standards are explicitly not primary standards. Id.

This definition is highly similar to the definition of a "secondary drinking water regulation" set forth in the SDWA and the applicable federal regulations. 42 U.S.C. § 300f(2). Federal regulations state that secondary MCLs are "the maximum permissible level of a contaminant in water which is delivered to the free flowing outlet of the ultimate user of [a] public water system." 40 C.F.R. § 143.2(f).

The federal secondary drinking water standards, and related regulations, "are not Federally enforceable but are intended as guidelines for the States." 40 C.F.R. § 143.1. The VWSR allows for some discretionary enforcement of secondary standards. VWSR § 6.13 ("water systems may be required to monitor and company with Secondary Standards" when the Secretary of ANR deems necessary.") (emphasis added).

**Discussion**

The Town has filed a Statement of Questions which contains two Questions. Question 1 asks at what point in the distribution system manganese testing must take place. Question 2 asks what the basis is for ANR requiring a 0.3 mg/L standard.

**I.      Whether manganese may be tested at the entry point to the distribution system**

The Permit states that manganese testing will occur at the entry point to the distribution system.  The Town argues that this is improper, and that manganese should be tested at the free flowing outlet of the end user.

ANR argues that it has the authority to require water systems to conduct manganese monitoring at locations protective of the public welfare.  It asserts that it properly exercised this authority by requiring monitoring at the entry point to the distribution system.  It asserts that this is where most contaminants in water systems are monitored.

We begin by noting that the Court owes deference to an agency's interpretation of policy terms when: (1) that agency is statutorily authorized to provide such guidance; (2) complex methodologies are applied; or (3) such decisions are within the agency's "area of expertise."  See Plum Creek Me. Timberlands, LLC v. Vt. Dep't of Forests, Parks & Rec., 2016 VT 103, ¶ 25, 20 Vt. 197.  Deference owed to an agency is not absolute, however.  In re Korrow Real Estate, LLC Act 250 Permit Amendment Application, 2018 VT 39, ¶ 21 (citations omitted).  An agency's authority to define terms within its statutory purview, here the VWSR, are afforded deference unless that authority is applied "arbitrarily and capriciously" such that it "give[s] rise to a violation of due process."  Woodford Packers, Inc., 2003 VT 60, ¶ 17, 175 Vt. 579.[1]

There is no explicit provision of the VWSR that denotes where the sampling of water to assess compliance with primary or secondary water standards should take place.  This is problematic in large part because a standard, specifically a concentration limit, without a defined sampling location is ambiguous.

While the SDWA and its associated regulations do not specifically set a sampling point, they do provide guidance.[2]  The National Secondary Drinking Water Regulations state that

---

[1] An agency's interpretation of federal law, even if it is related to its underlying authority, is not entitled to deference.  In re Stormwater NPDES Petition, 2006 VT 91, ¶ 13 n. 2, 180 Vt. 261.

[2] ANR asserts that its regulation of manganese is not bound by federal law because the authority to regulate public drinking water does not come from federal law but from Vermont law.  Citing 10 V.S.A. ch. 56.  It asserts that Chapter 56 provides a broader scope of authority than the SDWA.  Specifically, Chapter 56 provides that ANR "may establish by rule standards or requirements for . . . [d]rinking water quality" which must be "at least as stringent as the most recent national primary drinking water regulations" issued pursuant to the SDWA.  10 V.S.A. § 1672(b)—(1).  It further notes other aspects of Chapter 56 that are without a federal corollary.  It then asserts that we should only consult Vermont-specific law in conducting our analysis.

ANR is correct in noting that the SDWA and its associated regulations set the floor for states when regulating public drinking water systems.  However, to the extent ANR asserts that we should not consult or reference federal

secondary MCLs are "the maximum permissible level of a contaminant in water which is delivered to the free flowing outlet of the ultimate user of [a] public water system." 40 C.F.R. § 143.2(f). This frames secondary standards in terms of the free flowing outlet as opposed to the entry point. Cf. 40 C.F.R. § 141.23(a)(1) (requiring monitoring of groundwater systems under the National Primary Drinking Water Regulations to occur at the entry point to the distribution system) (emphasis added). Therefore, the federal secondary standards define the relevant MCLs, like the 0.05 mg/L MCL for manganese, by reference to the location of the free flowing outlet of the end user. As above noted, a numerical concentration limit has little regulatory value without reference to a specific location where that limit needs to be enforced. The federal standards provide that reference.

As stated above, the VWSR refers to and adopts the SDWA. VWSR § 1.1. It further adopts and incorporates by reference both the National Primary Drinking Water Regulations and the National Secondary Drinking Water Regulations. Id. In doing so, Vermont became the "primacy," or lead regulatory authority, for the SDWA instead of the EPA in Vermont. See also VWSR Introduction ("Public water systems are also subject to regulation under the federal Safe Drinking Water Act. By enacting this rule, the federal regulations will be administered by the Department of Environmental Conservation when it has 'primacy,' or primary administrative and enforcement authority."). While the VWSR was adopted pursuant to other Vermont-specific authority, and may contain provisions unrelated to the SDWA, the primary and secondary standard regulatory framework in the VWSR is mirrored in federal law and is not mentioned or created by Vermont law.[3]

We further note that ANR states that Vermont has not independently evaluated the necessity of the manganese MCL. While the VWSR did not explicitly define a testing location, it did draw from the federal regulations in setting the standard. As the federal regulations based the standard on the end user location, and a standard without a location, it is therefore

---

law when considering the present appeal, such an assertion is unfounded. Because federal law is, at least in part, the authority to regulate drinking water and, for the reasons stated below, the basis of the primary and secondary standards distinction, we may consult it in this action.

[3] Chapter 56 of Title 10 does mention the national primary standards when establishing the Secretary of ANR's authority to establish standards or requirements for drinking water quality by rule. 10 V.S.A. § 1672(b). Primary or secondary standards are not mentioned at any other point in Chapter 56 or the other cited authority for the enactment of the VWSR. See 10 V.S.A. ch. 48; 10 V.S.A. ch. 56; 10 V.S.A. ch. 61; 18 V.S.A. § 1218.

appropriate for us to consult and rely upon this related federal law when applying the VWSR in this matter.

Secondary standards and their related regulations are intended as guidelines for the states and are not federally enforceable. 40 C.F.R. § 143.1. We can find no reason why Vermont could not have adopted the SDWA and its related regulations, retained primacy over those regulations, but deviated from them by requiring monitoring for secondary standards in the VWSR to occur at the entry point to the distribution system. ANR did not do so. Instead, it effectively adopted the federal regulations' secondary standards without explicitly defining an alternative location where secondary contaminants should be monitored. As stated above, a contaminant concentration level without a testing location is an ambiguous standard. However, federal guidance sets secondary standards at the free flowing outlet and the VWSR adopted that guidance.

For all of these above reasons, we conclude that the SDWA, its associated regulations, and the VWSR define secondary standards in terms of the free flowing outlet at the ultimate user, such that testing for secondary standards must occur at that point.

II. **Whether ANR may impose a 0.3 mg/L standard for manganese**

Having reached the above conclusion, we turn to whether ANR may impose a 0.3 mg/L secondary standard for manganese. ANR asserts it is within its authority to impose a 0.3 mg/L manganese concentration limit that is based on a VDH health advisory level. The Town disagrees, asserting that ANR is effectively regulating manganese as a primary standard because it does not follow the stated secondary standard in the VWSR of 0.05 mg/L and seeks to address health concerns with the 0.3 mg/L standard that are improper when imposing secondary standards.

ANR asserts that issues related to health may be regulated through the use of secondary standards because health concerns fall within the typical meaning of the phrase "public welfare." It further notes that there is no definition of "public welfare" or "public health" within the VWSR.

In interpreting and applying administrative rules and regulations, such as the VWSR, the Court approaches regulatory construction in the same manner as statutory interpretation. In re Williston Inn Grp., 2008 VT 47, ¶ 14, 183 Vt. 621 (citing Conservation Law Found. v. Burke, 162 Vt. 115, 121 (1993)). We first "construe words according to their plain and ordinary meaning, giving effect to the whole and every part of the [rule]." In re Appeal of Trahan, 2008 VT 90, ¶ 19,

6

184 Vt. 262. It is our "paramount goal" to implement the intent of the drafters. Colwell v. Allstate Ins. Co., 2003 VT 5, ¶ 7, 175 Vt. 61. We will therefore "adopt a construction that implements the [rule's] . . . purpose and, in any event, will apply common sense." In re Laberge Moto-Cross Track, 2011 VT 1, ¶ 8, 189 Vt. 578 (quotations omitted); see also In re Bjerke Zoning Permit Denial, 2014 VT 13, ¶ 22 (quoting Lubinsky v. Fair Haven Zoning Bd., 148 Vt. 47, 49 (1986)).

Primary standards are those meant to protect public health. VWSR § 2.2. Secondary standards are those used to address issues related to drinking water's odor and color, as well as to regulate contaminants that "otherwise adversely affect the public welfare." Id. Importantly, secondary standards are "not primary standards." Id.

We note that the use of "public health" with respect to primary standards and "public welfare" with respect to secondary standards provides an indication that the two phrases are not effectively the same. See State v. DeRosa, 161 Vt. 78, 80 (1993) ("[W]e presume the [drafters] used the language [in the statute] advisedly."); State v. Camolli, 156 Vt. 208, 213 (1991) (same). If ANR sought to regulate public health concerns through both primary and secondary standards there does not appear to be anything stopping it from including the term in both provisions. Instead, the VWSR explicitly states that secondary standards are not primary standards. VWSR § 2.1. This reflects an intention for primary standards to regulate health concerns and secondary standards to regulate a distinct set of welfare concerns. See Camolli, 156 Vt. at 213 ("Had the Legislature intended to distinguish between specific tests, it would have used specific test names rather than the generic term 'test.'").

This is further supported by the tenet of statutory construction directing the Court to avoid an interpretation that would result in mere surplusage. In re Bove Demolition/Constr. Application, 2015 VT 123, ¶ 13, 200 Vt. 452 (citing In re Lunde, 166 Vt. 167, 171 (1997)). If the Court were to interpret "public health" to be included in "public welfare" the distinction between primary and secondary standards would become vague. This is because primary standards could be unnecessary if secondary standards could also be used to regulate both health concerns as well as other welfare issues. Further, this would permit ANR to avoid the more stringent review process necessary to create or modify a primary standard by regulating all concerns through the less-formalized secondary standards.

The distinction between public health and public welfare concerns mirrors that made in the SDWA and its associated regulations. 42 U.S.C. § 300f (1)—(2); see also 40 C.F.R. § 141; 40 C.F.R. § 142; 40 C.F.R. § 143. EPA states that secondary standards are "established as guidelines to assist public water systems in managing their drinking water for aesthetic considerations, such as taste, color, and odor. These contaminants are not considered to present a risk to human health at the [secondary ]MCL." U.S. EPA, SECONDARY DRINKING WATER STANDARDS: GUIDANCE FOR NUISANCE CHEMICALS, https://www.epa.gov/dwstandardsregulations/secondary-drinking-water-standards-guidance-nuisance-chemicals.[4] EPA states that it regulates contaminants through secondary standards because it:

> [B]elieves that if these contaminants are present in your water at levels above these standards, the contaminants may cause the water to appear cloudy or colored, or to taste or smell bad. This may cause a great number of people to stop using water from their public water system even though the water is actually safe to drink."

Id.

Federal case law interpreting this distinction supports EPA's statements that secondary standards address cosmetic and aesthetic issues, not health-related concerns. See, e.g., Nat. Res. Def. Council v. E.P.A., 812 F.2d 721, 724—25 (D.C. Cir. 1987) (upholding EPA's conclusion that the contaminant had a cosmetic impact affecting public welfare, not an impact affecting public health, and was therefore subject to a secondary, not primary, standard). This federal case law further reflects the distinction between public health and welfare in the regulation of drinking water.[5]

ANR asserts that it is entitled to deference for its interpretation that "public welfare" includes health concerns. ANR, however, does not explain how its conflation of the terms is compatible with the plain language and operation of the regulatory scheme. See In re Conservation Law Found., 2018 VT 42, ¶ 16 (citing In re Verburg, 159 Vt. 161, 165 (1992)

---

[4] We note that this literature was not submitted as an exhibit by either party in connection with the present motions. The Town, however, has cited this website and directed both the Court and the parties to this source.

[5] We note that federal law uses the primary and secondary standard distinction in the Clean Air Act as well. See 42 U.S.C. § 7409(b) (Clean Air Act). In this context, primary standards are those intended to protect public health and secondary standards are those intended to protect public welfare. Id. Federal law has noted and upheld the distinction between public health and welfare in this context. See, e.g., Union Elec. Co. v. E.P.A., 427 U.S. 246, 246 (1976); S. Terminal Corp. v. E.P.A., 504 F.2d 646 (1st Cir. 1974). While this law is not controlling in the present matter, we find it instructive in our present analysis.

(affording an agency's interpretation no deference when unreasonable results ensue); Conservation Law Found. v. Burke, 162 Vt. 115, 121 (1993) (affording an agency's interpretation no deference when it demonstrates compelling indications of error). In light of the above, we conclude that ANR's proffered interpretation is contrary to the principles of interpretation, particularly with respect to our paramount goal of implementing the regulatory intent, and the relevant law interpreting these terms.

We therefore conclude that secondary standards are not intended to regulate public health. Therefore, consideration of health concerns would be improper when setting or imposing secondary standards. Having reached this conclusion, we turn to whether ANR may impose a 0.3 mg/L manganese secondary standard.

The VWSR states that "water systems may be required to monitor and comply with the Secondary Standards contained in 40 CFR, Part 143 when, in the judgment of the Secretary [of ANR], compliance is necessary to protect the public welfare." VWSR § 6.13(b). As discussed in the preceding section, both the federal regulations and the VWSR set the manganese secondary standard at 0.05 mg/L. See 40 C.F.R. § 143.3; VWSR Table 6-2.

ANR asserts that it has not determined whether a 0.05 mg/L standard is necessary to protect the public welfare. It has, however, concluded with VDH that a 0.3 mg/L standard or less is necessary to protect public health, which it included in its definition of public welfare. Specifically, ANR and VDH concluded that the 0.3 mg/L standard is necessary to protect the health of infants and children under the age of 1 due to neurological concerns posed by exposure above that amount.

ANR concedes that the 0.05 mg/L standard was established due to manganese's aesthetic impacts on water above this level. Above 0.05 mg/L manganese can cause water to have a black or brown color, can cause black staining, and can result in water having a bitter, metallic taste. See SECONDARY DRINKING WATER STANDARDS: GUIDANCE FOR NUISANCE CHEMICALS, https://www.epa.gov/dwstandardsregulations/secondary-drinking-water-standards-guidance-nuisance-chemicals. ANR asserts that this does not preclude a higher, and less strict, standard when there are other welfare concerns, here health impacts.

For the reasons set forth above, the health impacts ANR is attempting to address are improper to consider when imposing a secondary standard. Addressing such impacts is at odds

with the definition of secondary standards, which are intended to limit contaminants which may "adversely affect the odor or appearance of such water and consequently may cause a substantial number of persons served by the Public water system providing such water to discontinue its use." VWSR § 2.1. Secondary standards are intended to regulate aesthetic and cosmetic impacts. To impose a less stringent standard that is protective of public health, a concern to be addressed by primary standards, but that would result in an adverse aesthetic impact to water as ANR suggests is improper based on the definition of secondary standards.[6]

Further, the secondary standard in the VWSR for manganese is not a maximum that permits ANR to impose contaminant limits up to the defined amount. Instead, the secondary standard is defined as a specific limit. See VWSR Table 6-2. As the VWSR currently operates, § 6.13(b) states that when the Secretary determines that imposition of a secondary standard is necessary to protect the public welfare, that determination activates the predetermined secondary standard. VWSR § 6.13(b). It does not initiate a discretionary review by ANR of what limits may be necessary. Here, such a determination by the Secretary would activate the specific 0.05 mg/L standard the VWSR define for manganese.

As such, we conclude that the 0.3 mg/L standard that ANR seeks to impose is not provided for by the VWSR.[7] Because ANR concedes aesthetic and cosmetic impacts were the basis for the imposition of the 0.05 mg/L standard, and that such impacts will occur above the stated secondary standard of 0.05 mg/L, it effectively concludes the public welfare requires imposition of a secondary standard for manganese for reasons aside from public health, we impose this standard on the Water System.

<strong><u>Conclusion</u></strong>

For the foregoing reasons, we conclude that, pursuant to the VWSR, and in light of the SDWA and its associated regulations, secondary standards are to be sampled at the free flowing outlet of the ultimate user. Further, because secondary standards are intended to protect cosmetic and aesthetic impacts, it is improper for ANR to regulate health impacts when imposing

---

[6] It is for this reason that we disagree with ANR's assertion that disallowing it to impose a less stringent secondary standard than that provided for in the VWSR is an absurd result.

[7] Nothing in this decision affects ANR's ability to adopt by formal rule a primary standard reflecting their proffered standard. We further note that, as a practical matter, it appears that the health concerns ANR raises will effectively be addressed by the more stringent secondary standard.

a secondary standard.  Also, the VWSR provides specific secondary standards, it does not permit discretionary adjustment of standards on a case-by-case basis.  Therefore, we conclude that ANR cannot impose a 0.3 mg/L manganese secondary standard based on health concerns to be measured at the entry point to the distribution system.  Instead, we conclude that ANR was limited to imposing a secondary standard for manganese of 0.05 mg/L, which would be measured at the free flowing outlet of the ultimate user.

We therefore **UPHOLD** ANR's grant of the permit presently on appeal, but **REMAND** this matter back to ANR for the ministerial act of issuing a permit consistent with our above decision.

This concludes the matter before the Court.  A Judgment Order accompanies this decision. Electronically signed on May 17, 2019 at 09:45 AM pursuant to V.R.E.F. 7(d).

_____

Thomas G. Walsh, Judge
Superior Court, Environmental Division