*Hulstrunk v. Ultracell Insulation, LLC*, No. 110-7-18 Oecv (Harris, J., Sept. 18, 2018).
[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

## STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT<br>Orange Unit | CIVIL DIVISION<br>Docket No. 110-7-18 Oecv |
| William Hulstrunk,<br>    Plaintiff<br><br>v.<br><br>Ultracell Insulation, LLC,<br>    Defendant | ENTRY ORDER |

Pending before the court in this matter are several pending motions. Presently ripe are Plaintiff's motion to stay (filed 8/15/18). Plaintiff's Motion Temporary Restraining Order ("TRO") (filed 8/24/18) may taken up before the Rule 6 / 78(a) reply memo period runs (here 9/27/18), particularly as UltraCell filed its opposition to such motion on 9/10/18.

At its crux, this case involves contested claims both as to [1] the applicability and enforceability of confidentiality / non-competition and mandatory arbitration provisions in certain limited liability company operating agreement(s), and [2] whether this court, or an arbitrator, should decide such issues. **The immediate status of the latter issue is the focus of this entry order.**

Plaintiff William Hulstrunk ("Plaintiff" or "Mr. Hulstrunk") is a former Vice President of Technical Services For Defendant UltraCell Insulation, LLC ("Defendant" , the "Company", or "UltraCell"). UltraCell is a Buffalo, NY- based limited liability company ("LLC") that manufactures cellulose insulation and is formed as a Delaware LLC.

The events that frame the issues for this entry order largely predate the filing of this action and are extensively set out in the parties' motion memoranda and supporting affidavits, as well as in prior court proceedings. For purposes of this order, complete details of such factual and procedural background are not repeated here but are, in some regards, summarized.

Mr. Hulstrunk is an Orange County, Vermont resident who had over 20 years' experience in the building insulation industry when he was approached by UltraCell to work for them, after doing some initial work in November 2015 as a consultant. In January 2016, Mr. Hulstrunk accepted an employment position as a "Technical Manager". As part of this agreement he agreed to receive 15,000 Class B Units in UltraCell.

Acquisition of ownership of LLC units in the LLC, if accomplished, would create a second legal relationship between Mr. Hulstrunk and UltraCell in addition to their employee/employer relationship. Once Plaintiff became a LLC member, he would be subject to the rights and responsibilities associated with LLC documents that applied to him, such as operating agreement(s).

In his employer/employee relationship with UltraCell, in the January 2016 Technical Manager employment letter, the Company stated Mr. Hulstrunk would be required to sign an additional employment agreement that "will include provisions relating to non-competition, non-solicitation, confidentiality and assignment of inventions". According to Mr. Hulstrunk, as some point he was sent a draft agreement with proposed restrictive covenants, but he never signed it or agreed to those terms.

Presumably, from the employee/employee relationship context, had UltraCell presented such additional agreements to Mr. Hulstrunk, demanded that he sign, and he refused to do so - UltraCell could have then terminated their at will employment relationship. See example, *Madden v. Omega Optical, Inc.*, 165 Vt. 306 (1996). As noted, these steps did not occur. Any acquisition of confidentiality/non-compete rights against Plaintiff by UltraCell occurred under the LLC unit acquisition processes described below.

The Class B Unit grant agreement, to effectuate the transfer of the 15,000 Unit acknowledged to occur under Mr. Hulstrunk's employment agreement, was taken up in February 2016. Mr. Hulstrunk signed the grant agreement. In doing so he confirmed that the grant of the Units was subject to the LLC's Operating Agreement. (At that time the Company had a second amended and restated operating agreement). Under the unit grant agreement he signed, Mr. Hulstrunk acknowledged receipt of the UltraCell Second Operating Agreement and stated that he "agrees to be bound by the terms thereof." Facially, that Second Operating Agreement contained provisions about keeping certain defined Company "Confidential Information" confidential and a broad two-year non compete provision, with non-solicitation of customer provisions.

The UltraCell LLC operating agreement in February 2016 stated unit purchase completion steps. They included that Mr. Hulstrunk execute a counterpart signature page to the LLC Operating Agreement (separate from the purchase agreement). This was never done.

In January 2017, Mr. Hulstrunk and UltraCell signed a purchase agreement for Plaintiff to purchase 35,000 Units of "Class A Preferred Class Units". On 1/27/17 Mr. Hulstrunk signed the purchase agreement, which stated purchasers "will enter into the LLC Agreement and be

2

admitted as members and Unitholders of the company." The Agreement further stated that purchaser (that is Mr. Hulstrunk) "will execute a letter of acceptance, in form satisfactory to the Board, of all of the terms and conditions of the LLC Agreement". No such letter of acceptance as ever prepared, submitted or signed. It appears Mr. Hulstrunk delivered a $350 check to pay for his 35,000 Class A Units.

In or around June 2017 UltraCell amended and restated its operating agreement into a third version the court refers to as the Third Operating Agreement. It continued to include the confidentiality/ non-compete provisions.

In August 2017 a new position was offered to Mr. Hulstrunk, under a letter offer of employment that he signed shortly thereafter. He was promoted to the position of "Vice President of Technical Service". Like the Technical Manager position employment agreement, the accepted employment agreement for the new position included a provision that Mr. Hulstrunk would be required to sign an additional employment agreement that "will include provisions relating to non-competition, non-solicitation, confidentiality and assignment of inventions". Again, apart from the exchange of the draft agreement with restrictive covenants described above[1], no separate job position-specific confidentiality/ non-compete agreements were ever demanded or required as an employment condition.

The August 2017 letter made reference to granting Mr. Hulstrunk 50,000 Class B Membership Units, upon signing a vesting agreement. Unlike the January 2016 Technical Manager employment agreement letter, where the unit transfer under a vesting agreement was promptly followed by execution of vesting agreement paperwork, no further Calls B Unit vesting agreement or related paperwork was executed by the parties.

Mr. Hulstrunk accepted a job with Nature-Tech, a Wisconsin based company, in November 2017. Issues exist as to whether that employment and/or Mr. Hulstrunk's activities for his new employer, violate the LLC agreement confidentiality/ non-compete provisions. Mr. Hulstrunk undoubtedly possessed considerable cellulose insulation expertise amassed before he worked at UltraCell, and during that employ learned considerable non-public knowledge about some of its particular products and/or manufacturing processed.

---

[1] It is unclear at what point in time this presentation or exchange of proposed restrictive covenants occurred between Mr. Hulstrunk and the Company independent of the LLC unit transactions described in the opinion.

Litigation promptly ensued. UltraCell claimed Mr. Hulstrunk was bound by the Company's Operating agreement's confidentiality / non-compete provisions. He contended he was not so bound.

On 11/20/17 Mr. Hulstrunk filed a federal court diversity jurisdiction action in the District of Vermont, seeking declaratory relief that he was not a UltraCell unit holder and was not bound by the operating agreements' confidentiality / non-compete provisions. UltraCell promptly sought a preliminary injunction to enforce the restrictive provisions in the operating agreement while the federal action was pending.

The case slogged through initial pleadings, discovery and hearing preparation, resulting ultimately in a 95-entry federal docketing statement. (See Plaintiff's Motion to Stay Arbitration, Exhibit A). Counterclaims were asserted against Mr. Hulstrunk for misappropriation of trade secret and breach of contract, and injunctive and declaratory relief and recovery of monetary damages by. (See Exhibit C to David Gwitt Affidavit filed with Defendant's Motion to Dismiss, "*Gwitt Affidavit*".). Nature-Tech was sued under a Third Party Complaint asserting the usual claims against the departed employee's new employer in these situations.

It became pretty clear as things progressed that a double threshold question was presented as to whether Mr. Hulstrunk was an UltraCell member. First, Plaintiff's alleged LLC membership status was the nexus to bind him to the restrictive covenants in the operating agreement(s). Second, as party counsel called to the federal court's attention in or around March 2018, Plaintiff's LLC membership status also impacted the federal court's diversity jurisdiction. If Mr. Hulstrunk was an UltraCell "member", since for diversity jurisdiction purposes a LLC expansively shares citizenship with *each* of its members, such a determination would destroy the Vermont federal court's jurisdiction to act further.

In the midst of these federal proceedings, on March 12, 2018 UltraCell amended its operating agreement to a fourth operating agreement. (the "Fourth Operating Agreement"). (*Gwitt Affidavit*, Exhibit A). Mr. Hulstrunk states he was not informed or consulted about the adoption of the Fourth Operating Agreement. Such adoption occurred four months after he had left the Company and while he was litigating whether he even was a Company member.

The Fourth Operating Agreement, for the first time, included a broad mandatory arbitration clause, at Section 13.9. It required exclusive, binding commercial arbitration with JAMS in "the event of a dispute, claim, or controversy arising out of or relating to this [Operating] Agreement or the validity or performance thereof or the transactions contemplated".

No mention of the new arbitration clause was made in the federal court. Nor were any demands to arbitrate issued under it. As the clause was adopted by UltraCell, the parties in this action were litigating Mr. Hulstunk's membership status. If he was determined to not be an UltraCell member, the Company would not have the basis to assert a right to arbitrate against Mr. Hulstrunk.

On 7/18/18 Judge Crawford issued a nine-page decision. He made extensive findings and concluded Mr. Hulstrunk was indeed a UltraCell member, and thus that the federal court lacked subject matter jurisdiction to hear the declaratory judgment request outlined in the complaint. He dismissed the complaint. Other stipulations and orders to close out the federal action followed.[2]

Further proceedings swiftly occurred.

Mr. Hulstrunk filed this action 7/19/18. The initial complaint sought declaratory judgment determination that he was not a UltraCell "member", similar to the federal action.

On July 25, 2018, UltraCell filed a demand for arbitration with JAMS. (Gwitt Affidavit, Ex. F, included in Defendant's motion to dismiss).

On or around 8/8/18 Plaintiff filed an Amended Complaint. It largely added pleadings alleging that if Plaintiff were made subject to the restrictive covenants, they were non-enforceable as they were overbroad, never agreed and were unreasonable and unenforceable (as well as not violated). He seeks declaratory relief as to these claims, and trial by jury on triable issues.

Since the Amended Complaint was filed Plaintiff filed a motion to stay the arbitration (8/15/18) and a motion for a TRO (8/24/18). Defendant filed a motion to dismiss (8/20/18) contending that all claims between the parties are subject to the mandatory arbitration clause and should be heard in the JAMS arbitration proceeding.

Each party has participated to some degree in the proceedings in the forum which the party contends has no right to hear the matters in dispute. UltraCell has moved to dismiss these proceedings so it can pursue the arbitration action it initiated. Mr. Hulstrunk reportedly filed motions and or responses in the JAMS arbitration stating it has no authority to proceed and should dismiss the arbitration and/or defer or stay it while he pursues this action.

---

[2] A stipulation to dismiss the third party complaint without prejudice was filed 8/6/18 and approved that day. Federal action Docket Entries 92 and 93. On the same day an order dismissing all pending motions without prejudice as moot, and a judgment of dismissal of the complaint for lack of subject matter jurisdiction and the third party complaint without prejudice, were signed. *Id*, entries 94 and 95.

On August 30, 2018 Attorney Elizabeth Carter, a Vice President for the East Central Region of JAMS, issued a brief letter reciting JAMS's conclusion that as it received the Fourth Operating Agreement with Section 13.9(b), referring disputes to arbitration with JAMS, and JAMS Streamlined Arbitration Rule 8(b) refers issues as to the existence, validity and scope of an arbitration clause to the arbitrator for determination, JAMS could continue to administer the arbitration demand in the matter. (Defendant's Opposition to TRO Motion, Exhibit 2).

The present simultaneous dual proceedings in the JAMS arbitration action and this suit, exposes both parties' to duplicative expenses, but also the possibility of competing and conflicting adjudications as to whether Mr. Hulstrunk is subject to the restrictive covenants and if they are enforceable against him, and the scope of the restraints the provisions may impose.

**Legal Analysis**

The core present issue is whether this court should enjoin the JAMS arbitration, at least long enough for this court to determine if Mr. Hallstunk is bound to the mandatory arbitrations clause, and if so, whether this court or the arbitrator should determine any preliminary pre-arbitration issues. A TRO in essence would allow this court to make an orderly assessment if the JAMS arbitration should go forward, before the arbitration continues on its present copurse.  If the arbitration proceeds, and the court decides it should have not have done so,  the court and parties will face an unwieldy mess to untangle conflicting orders and directives.

Before proceeding to the standards to stay, a few preliminary points regarding the impact of arbitration acts on matters need to be described. The arbitration clause is "in play" for this court, for stay determination purposes, even if the court determines later it does not apply to Mr. Hulstrunk.  The parties have alternatively cited to the Vermont Arbitration Act ("VAA") and the Federal Arbitration Act ("FAA") as applying to the arbitration provision in the operating agreement. The provision is in a Buffalo, NY-based Delaware LLC's operating agreement with a Vermont resident, and involving the member and LLC's activities in states including those outside of Vermont.

The court concludes the FAA applies to the provision.  As the Vermont Supreme Court recently stated in *Hermitage Inn Real Estate Holding Company, LLC v. Extreme Contracting, LLC*, 2017 VT 44, ¶ 14, fn. 1:

> The Federal Arbitration Act provides that a contractual arbitration provision is enforceable if the provision is in a contract "evidencing a transaction involving commerce." 9 U.S.C. § 2. In *Allied–Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995), the United States Supreme Court held that the scope

clause meant that the Act applied if the contract in fact affected interstate commerce, in essence employing the limit of Congress's power under the Interstate Commerce Clause of the U.S. Constitution. See id. at 274, 281, 115 S.Ct. 834. The Court concluded that an arbitration provision in a contract between a termite exterminator and a homeowner came under the Act because it involved interstate commerce. Id. at 282, 115 S.Ct. 834.

The parties' commercial transactions undoubtedly impacts interstate commerce in at least equal accord than a homeowner/ exterminator termite extermination contract. While state law may determine if the parties agreed to arbitrate, assuming they did so, then the FAA preempts inconsistent state arbitration laws. See *Progressive Cas. Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela*, 1993, 991 F.2d 42 (2d Cir. 1993).

As the U.S. Supreme Court has noted, "§ 4 of the FAA does not confer a right to compel arbitration of any dispute at any time; it confers only the right to obtain an order directing that 'arbitration proceed *in the manner provided for in [the parties'] agreement'* 9 U.S.C. § 4". *Volt Information Sciences, Inc. v. Bd of Trustees of Leland Stanford Junior University*, 489 U.S. 466, 474-75, 109 S. Ct. 1248, 103 2d 488 (italics in original). The FAA "does not require the parties to arbitrate when they have not agreed to do so." *Volt Information, supra*. In *Volt Information* the Court noted some state law impacts on arbitration may be permissible if the purposes of the FAA are not impacted. The FAA does not preempt the entire arbitration field. *Id.*

Thus both arbitration acts may play a role in applying the arbitration clause, with the FAA playing a limited preemptive role – if the VAA undercuts the federal law and its objectives. While the FAA has no express provision to stay an arbitration if there is finding that the parties failed to agree to arbitrate, the VAA has such a provision. 12 V.S.A. § 5674(b). This section provides:

> On application to compel or stay arbitration, and on a showing that there is no agreement to arbitrate, the court may stay a commenced or threatened arbitration proceeding. When in substantial and bona fide dispute, the issue of whether there is an agreement to arbitrate shall be forthwith and summarily tried. The court shall order the stay if it finds no enforceable agreement to arbitrate. Otherwise, the court shall order the parties to proceed to arbitration.

Consideration of a stay of an arbitration the parties have not agreed to is permissible under the FAA and federal law considering its application. As the U.S. Supreme Court stated in *Granite Rock Co. v. International Broth of Teamsters*, 561 U.S. 287, 296 (2010), whether the parties have agreed to submit a particular matter to arbitration is typically a matter for courts to decide. The court recognizes that where an arbitration clause is clearly agreed to and it provides the arbitrator

a clear, broad and specific mantle of authority to decide what is to be arbitrated, courts may give such a provision effect.

But that presumes the parties' agreement to be bound to such a clause has been shown. Where the dispute is over the formation of the arbitration contract formation, that issue is generally for the courts to decide. *Granite Rock Co., supra*, (citing *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter ... courts generally ... should apply ordinary ... principles that govern the formation of contracts"); *AT & T Technologies, supra,* at 648–649, 106 S.Ct. 1415 (explaining the settled rule in labor cases that " 'arbitration is a matter of contract' " and "arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration"); *Buckeye Check Cashing, Inc. v. Cardegna,* 546 U.S. 440, 444, n. 1, 126 S.Ct. 1204, 163 L.Ed.2d 1038 (2006) (distinguishing treatment of the generally nonarbitral question whether an arbitration agreement was "ever concluded" from the question whether a contract containing an arbitration clause was illegal when formed, which question we held to be arbitrable in certain circumstances). Where the parties are found to not have agreed to arbitrate, declining to order arbitration does not offend the FAA. *Volt Information, supra* (noting the FAA "does not require the parties to arbitrate when they have not agreed to do so) See also *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009) (same).

When an issue exists as to whether a contract was formed courts should apply state law principles as to contract formation. See, *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L2d 985 (1995); *Mastrobuono v. Shearson Lehman Hutton, Inc. 514 U. S. 52*, 62-63, and n. 9, 115 S.Ct. 1212, 1218-1219, and n. 9; *Volt Information, supra,* 489 U.S. at 475-476, 109 S.Ct. at 1253-1254; *Perry v. Thomas,* 482 U.S. 483, 492-493, n. 9, 107 S.Ct. 2520, 2526-2527, n. 9, 96 L.Ed.2d 426 (1987).

With these principles in mind the court moves on to the issue of Mr. Hulstrunk's stay request.

Rule 65 allows courts to enter preliminary injunctions and TRO's. The factors to be applied, similar to those used under Federal Rule 65, are (1) the threat of irreparable harm to the movant; (2) the potential harm to the other parties; (3) the likelihood of success on the merits; and (4) the public interest. *Taylor v. Town of Cabot*, 2017 VT 92, ¶ 19, 178 A.3d 313. Preliminary injunctions and TRO's are an extraordinary remedy and are not granted as a matter

of right. *Id*, quoting *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).

Some federal courts construe the the "likelihood of success on the merits", with a degree of pragmatism to be met by a showing of "sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in their favor", or similar formulations.[3] The Vermont Supreme Court in *Taylor* essentially applied this standard in Vermont as "our test calls for a balancing of multiple factors, including the likelihood of success on the merits, it is sufficiently flexible to allow for a preliminary injunction in cases in which the court cannot definitively conclude that the movant is likely to prevail on the merits, but the balance of other factors tips strongly in favor of an injunction". *Id*, at footnote 3, after citing the hardship-balance-tipping test stated in *General Mills, Inc. v. Chobani, LLC,* 158 F.Supp.3d 106, 115 (N.D.N.Y. 2016).

### *[1] Irreparable harm*

Mr. Hulstrunk claims that being forced to defendant himself in the JAMS action, for an arbitration he never agreed to, is a form of irreparable injury. (Motion For TRO, page 2). This view has significant legal support. *See example, Monavie, LLC v. Quuxtar, Inc*., 741 F.Supp. 1227, 1242 (D. Ut. 2009) (concluding, after drawing upon cases that find expenditure of energy, cost and fees in unnecessary litigation can pose "irreparable harm" that " the injury to a party who is forced to submit to arbitration when it did not agree to do so constitutes *per se* irreparable harm for purposes of preliminary injunctive relief") *Herbert J. Sims & Co. v. Roven*, 548 F. Supp. 2d 759, 766 (N.D. Cal. 2008) (finding a plaintiff would suffer irreparable harm if forced to arbitrate a dispute not subject to arbitration because it would have "no adequate remedy at law to

---

[3] *General Mills, Inc. v. Chobani, LLC*, 158 F.Supp.3d 106, 115 (N.D.N.Y. 2016). See also for example, *Okla. ex rel. Okla. Tax Comm'n v. Int'l Registration Plan, Inc.,* 455 F.3d 1107, 1113 (10th Cir.2006)(If the moving party demonstrates that the other three factors "tip strongly in his favor, the test is modified," and the moving party "may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue for litigation and deserving of more deliberate investigation.") ; *Homeowners Against the Unfair Initiative v. Calif. Building Industry Assoc.,* 2006 WL 5003362, *2, 2006 U.S. Dist. LEXIS 97023, *4 (S.D.Cal. Jan. 26, 2006) (citing *Immigrant Assistance Project of the L.A. County of Fed'n of Labor v. INS,* 306 F.3d 842, 873 (9th Cir.2002)) (The standard for issuing a TRO is similar to the standard for issuing a preliminary injunction and requires that the party seeking relief show either "(1) a combination of likelihood of success on the merits and the possibility of irreparable harm, or (2) that serious questions going to the merits are raised and the balance of hardships tips sharply in favor of the moving party.").

recover the monetary and human capital it would expend defending itself in arbitration"); see also *Goldman Sachs & Co. v. Becker*, No. C 07 01599 WHA, 2007 WL 1982790, at *7 (N.D. Cal. July 2, 2007) (finding that a party will suffer irreparable harm if arbitration is not stayed); *Credit Suisse Sec. (USA) LLC v. Sims*, No. CIV.A. H–13–1260, 2013 WL 5530827, at *3 (S.D. Tex. Oct. 4, 2013) ("Plaintiffs will suffer irreparable harm if they are forced to participate in an arbitration where the dispute is not subject to an agreement to arbitrate"); *Chase v. Manhattan Bank USA, N.A. v. Nat'l Arbitration Counsel, Inc.*, No. 3:04–cv–1205, 2005 WL 1270504, at *4 (M.D. Fla. May 27, 2005) ("being compelled to arbitrate a claim in the absence of an agreement to arbitrate that claim constitutes an irreparable injury"); *CCD Clearing, LLC v. LoBue*, Case No. EDCV 16–909 JGB (KKx), 2016 WL 9088704 (C.D.Cal. June 16, 2016)(finding that the "plaintiff will suffer irreparable harm if it is forced to participate in an arbitration where the disputes at issue are not subject to an agreement to arbitrate"); *Tiffany v. KO Huts, Inc.*, 178 F. Supp. 3d 1140, 1148–49 (W.D. Okla. 2016)(adopting Eight Circuit's view that having to incur unnecessary arbitration costs for an arbitration one has not been shown to have agreed to may constitute irreparable harm for purposes of enjoining such an arbitration) ); *PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 515 (3d Cir. 1990)( stating "we think it obvious that the harm to a party would be *per se* irreparable if a court were to abdicate its responsibility to determine the scope of an arbitrator's jurisdiction", *overruled on other grounds by Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85 (2002)).

The court accepts these formulations of irreparable harm. As noted below this is precisely a case where the topic of whether Mr. Hulstrunk is subject to the arbitration clause is replete with considerable issues. This is not the typical arbitration case where the arbitration clause is provision in a mutual agreement clearly agreed to and signed before the controversy in issue arose between the parties.

### [2] Potential Harm to Non-Moving Party

Scant detail is given as to the specific harm to UltraCell may sustain if the arbitration is stayed while this court sorts out in which forum the restrictive covenant issues should be decided.  If the court merely determines no agreement to arbitrate existed, UltraCell is not really harmed.  If the court stays the JAMS arbitration proceeding and later determines it is proper and should proceed, UltraCell has the potential harm of delay in having its arbitration clause enforced, with Mr. Hulstrunk left unrestrained during the period of delay in having the restrictive covenants interpreted and deemed enforceable.

However Mr. Hulstrunk has worked for Nature Tech for almost a year, and no specific harm (release of inside confidential UltraCell proprietary information; solicitation of its customers or employees, etc.) has been shown. He claims to not be soliciting Company employees or using inside Company information. Measures to mitigate this potential harm to UltraCell exist if an arbitration stay was ordered. For example the court could impose temporary activity and information use restrictions on Mr. Hulstrunk, if the arbitration proceeding was stayed to sort out which proceeding should hear these matters.

### *[3] Likelihood of Success on the Merits –*

This factor is of importance. In the specific context by which the arbitration clause arose, this factor has some nuances.

A keystone issue is whether Mr. Hulstrunk is an UltraCell member. The Company claims collateral estoppel effect of the dismissed federal action. Mr. Hulstrunk argues no binding or other effect should be given the Judge Crawford's opinion that formed the basis for him to dismiss the federal diversity action for lack of subject matter jurisdiction.

As UltraCell notes, Vermont collateral estoppel principles relate to issue preclusion. Under the doctrine precludes re-litigation of an issue previously litigated by the same parties when five discrete criteria are present:

> (1) it is asserted against one who was a party in the prior action; (2) the same issue was raised in the prior action; (3) the issue was resolved by a final judgment on the merits; (4) there was a full and fair opportunity to litigate the issue in the prior action; and (5) its application is fair.

*In re Stormwater NPDES Petition,* 2006 VT 91, ¶ 23, 180 Vt. 261, 910 A.2d 824; *Trepanier . Getting Organized, Inc.*, 155 Vt. 259, 295 (1990). Facially the issue of re-litigating Mr. Hulstrunk's UltraCell membership status appears appropriate to be reviewed under this five element test. Applicability of collateral estoppel is a question of law. *In re Stormwater NPDES Petition, supra.* Clearly the same parties and issue was presented. A full and fair opportunity to litigate that issue was presented – discovery was allowed and taken and the parties focused on the need to present facts, documents and legal arguments on that very issue. On the "final judgment on the merits" issue, although the dismissal was for lack of subject matter jurisdiction, the necessary factual basis for that dismissal was based on the appealable "membership" status

11

factual and legal determination[4]. Although Mr. Hulstrunk's arguments lacked traction with Judge Crawford, the court's decision to dismiss for lack of subject matter, based on the membership status determination issue,  was appealable to the Second Circuit Court of Appeals.  With Mr. Hulstrunk having initiated the federal action, and requesting court declaration as to his membership status, it would seem fair to bind him to the result and not allow him to seek second adjudications from other courts on the very same issue.

In response, Mr. Hulstrunk cites F.R.C.P. 41(b) and federal case law.  Under Rule 41(d) dismissal for lack of jurisdiction is one of the exceptions from the federal action dismissal being "on the merits".  As he notes the Seventh Circuit, in *Buker Ramo Corp. v. United Bus. Forms,, Inc.* , 717 F.3d 1272, 1279 (7th Cir.) 1983) has observed that once a federal court expresses its view that it does not have subject matter jurisdiction, any findings it makes in that process carry no res judicata consequences.  As one leading treatise has explained,

> [i]f a first decision is supported by findings that deny the power of the court to decide the case on the merits and by findings that go to the merits, preclusion is inappropriate as to the findings on the merits. A court that admits its own lack of power to decide should not undertake to bind a court that does have power to decide.

18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 4421 (1981).  It is common sense that for res judicata *claim* preclusion purposes, after a subject matter jurisdiction dismissal the second court should be unfettered by the first court's factual determinations in deciding if the claim is precluded independent of the reasoning of the court in the dismissed court action.  From the cases cited and the court's initial limited legal research it is unclear if the ambit of the federal post-dismissal preclusion scope limitation also extends to *issue* preclusion as to the key factual issues decided that were necessarily and centrally decided by the federal court before it dismissed its action.

If the preclusive effect courts are to give to factual and legal findings made by federal courts in their  subject matter determinations is very broad -  and in effect required all determinations to be treated as dicta -  this court does not believe any party statements, agreements or stipulations as to what they were asking the federal court to do, change the scope of the preclusive affect the dismissal order opinion carried, as a matter of law, as it was entered.

---

[4] For collateral estoppel purposes, the "final judgment on the merits" element requires both that the issue was actually litigated in the prior proceeding and that its resolution was "necessary to the resolution of the [prior] action". *Faulkner v. Caledonia County Fair Association*, 2004 VT 123, fn. 6, 178 Vt. 51,  quoting *Am. Trucking Ass'ns v. Conway,* 152 Vt. 363, 369, 566 A.2d 1323, 1327 (1989

The court agrees with Plaintiff that the U.S. Supreme Court disagrees with the concept that a district court can assume hypothetical jurisdiction for making a merits adjudication, as such an approach offends traditional separation of powers. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94 (1989). "On every writ of error or appeal, the first and fundamental question is that of jurisdiction, first, of this court, and then of the court from which the record comes. This question the court is bound to ask and answer for itself, even when not otherwise suggested, and without respect to the relation of the parties to it." *Great Southern Fire Proof Hotel Co. v. Jones*, 177 U.S. 449 (1900).

These uncertainties may mean Mr. Hulstrunk will be able re-litigate his membership status here free of collateral estoppel issue preclusion. At final hearing the issue may be looked at more closely under the law.

However these present observations do not equate to a current assessment that Plaintiff has shown a likelihood of success on his claim of non-membership status. Even if it is not bound by Judge Crawford's membership status analysis, this court at present finds Judgfe Crawford's conclusions reasonable. As to the final formal steps to complete the Company membership units' issuance, the parties had no significant issues to still resolve. Mr. Hulstrunk had confirmed receipt of copies of the operating agreements and the final acts were of a ministerial nature. Further under general Delaware contract law in some circumstances acceptance of a contract may be implied from the acts and conduct of the party to whom the offer is made. See example, *Corporation Service Co. v. Kroll Associates, Inc*., Docket No. No. Civ.A.99C–12–210–JRS, Superior Court of Del., (June15, 2001) 2001 WL 755934*; Whittington v. Dragon Group, LLC, Docket* Civil Action No. 2291–VCP, Ct. of Chancery off Del. (March 1, 2013), 2013 WL 1821615.

At later hearings the court will more deeply consider how strictly courts have applied the Delaware LLC law provisions Mr. Hulstrunk cites, to the effect that LLC membership admission requires adherence to the LLC operating agreement and Delaware members' decisions how to run their LLC's should be afforded respect and followed.

This does not end the present likelihood of success analysis. At most, a determination that Mr. Hulstrunk was an UltraCell member at the time he left the Company would have subjected him to the Third Operating Agreement as the parties started their litigation and dispute. Under that form of the Operating Agreement, certain forms of Operating Agreement amendment required additional considerations to typical operating agreement amendments. Specifically,

13

under Section 12.2(b)(i) of the Third Operating Agreement, any amendment to the agreement that had a disproportionate and material adverse impact on a Unitholder is not enforceable against that Unitholder who is adversely impacted, without their prior written consent. (See Michelle Patton Affidavit, Exhibit C).

As to these parties the operative contact to arbitrate (that contained the first mandatory arbitration clause) was the creation of the Fourth Amended Operating Agreement in March 2018, as the Third Operating Agreement contract was replaced.

The court finds serious questions (i.e. support) going to success on the merits as to Mr. Hulstrunk's claim that the addition of Section 13.9 had a disproportionate and material adverse impact on him. (This assumes he is indeed found to be a Company member). The provision adoption must be viewed in the time and context of when it was adopted and its impact on the then existing LLC members. At the time the provision was adopted, one of the members (Plaintiff) was actively engaged in post-employment court litigation over matters arising out of the member's transactions with the LLC. The second and third operating agreements of the LLC allowed disputes involving LLC membership matters, or involving the operating agreements' terms, to be litigated in court. Adoption of the new mandatory arbitration provision had a disproportionate impact on Mr. Hulstrunk – he had an identified, and active, operating agreement provision (restrictive covenant) dispute brewing with the Company. He was no longer employed with the Company and the Company was demanding that he comply with the restrictive covenant provisions and also suing him in a counterclaim for monetary recovery for his refusal to comply. (Federal Action Docket, Entry 2; *Gwitt Affidavit*, Exhibit C).

Given these then existent conditions, UltraCell's contention the clause was not "disproportionate" because it facially applied to all members, carries little persuasive impact. Under UltraCell's logic, a new operating agreement provision adopted at this time, requiring all members no longer employed by the Company to surrender their units and pay a $1,000 per unit surrender fee within 7 days, might equally be viewed as non -disproportionate as it applied to all members. The new provision's *impact*, not its facial *applicability,* is what mattered.

The mandatory arbitration clause had a material adverse impact on Mr. Hulstrunk. If applied to him, the clause eliminated his right to proceed to court, with trial by jury on triable issues of fact, as to his contractual operating agreement dispute, as well as any contract-based or tort counterclaims UltraCell might bring against him for alleged violations of the disputed restrictive covenants. Access to courts for claim resolution also allows for meaningful appellate

14

review of the trial court result, and the factual and legal basis on which that result is premised. Arbitration does not allow for such review as a check or balance against erroneous decision making.

Lastly the court addresses the arbitration waiver arguments. Generally under the FAA the issue of waiver is for arbitrators, not the court. to decide if an agreement to arbitrate is otherwise existent. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 123 S.Ct. 588, 154 L.Ed.2d 491 (2002); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). Thus determination of this issue may not be germane to the likelihood of success of an arbitration stay request. Waiver issues (and who decides them) may be taken up after a decision is made on whether there was an agreement to arbitrate.

In any event, the court is hard pressed to find UltraCell's conduct here should support a finding of waiver. The alleged operative mandatory arbitration agreement was added to the operating agreement at the time UltraCell and its purported member (Plaintiff) were embroiled in a high stakes federal court litigating whether Mr. Hulstrunk was a Company member. While notice of the new clause, and a demand to arbitrate, could have been made in the federal action, it is pretty clear they would have lay dormant until the central "membership" declaratory decision was reached. Arbitration was demanded within a week of the membership being adjudicated, while timelines for motions to alter or amend the federal order (F.R.C.P. 59) and/or to appeal the subject matter dismissal decision, had not lapsed. UltraCell's decision to file memos and motions in this action, to dismiss it to allow the JAMS arbitration that Defendant believes controls, should not be viewed as a waiver of the right to enforce and proceed to mediation. Mr. Hulstrunk renewed his efforts for court determination of the membership issue and for UltraCell to not make a response, out of fear it would be deemed a "waiver", would create an unfair situation for UltraCell. The need to participate in the Hulstrunk lawsuits was not just to resolve which forum a clearly agreed to arbitration clause should be litigated. The federal, and now this, court actions sought preemptive strike determinations for Plaintiff that the arbitration right simply never existed and thus any JAMS action was void.

[4] The Public Interest

No compelling case-specific public interest, involving the general public, has been shown to lie in balance depending upon whether the court stays the JAMS arbitration. The societal

15

mechanisms used to decide complicated matters of import – whether they be arbitration or lawsuits – are ill-served where important matters are decided in haste. It is not in the public interest for parallel actions to proceed under a decision making race with the hopes that expediency and the temporary primacy of the first body's decision will be afforded priority, regardless of the quality of the result.

Further when initial significant issues exist as to one body's authority to act, "[a]llowing an arbitration to proceed without an agreement to arbitrate does not serve the public interest." *Berthel Fisher & Co. Financial Servs. v. Frandino*, No. CV 12–02165 PHX (NVWx), 2013 WL 2036655 at *8 (D. Ariz. May 14, 2013); see also *Berthel Fisher & Co. Fin. Servs. v. Larmon*, No. CIV. 11–889 ADM/JSM, 2011 WL 3294682, at *8 (D. Minn. Aug. 1, 2011) aff'd, 695 F.3d 749 (8th Cir. 2012) ("Public confidence in arbitration would be undermined if a party could be compelled to arbitrate without its consent'); Accord *CCD Clearing, LLC v. LoBue*, Case No. EDCV 16–909 JGB (KKx), 2016 WL 9088704 (C.D.Cal. June 16, 2016).

### Summation

Taken all together, the court concludes the significant showing Mr. Hulstrunk will succeed on his claim the recently adopted arbitration clause does not apply to him, coupled with the hardship of his being exposed to arbitration proceedings that his showing suggests he should not be subjected to; along with the public interest that the issue of whether contract with the arbitration clause applies to him is correctly decided; and limited hardship to UltraCell while the matters are sorted out - weigh in favor of a TRO in Mr. Hulstrunk's favor.

As a separate ground to issue a stay, the court views § 5674(b) of the VAA as authorizing a Vermont court to stay an arbitration, where it initially determines that it is likely that no agreement to arbitrate, but there are substantial and bona fide disputes on such issue that can be resolved by a prompt hearing and final order whether to make the stay permanent or order the arbitration to proceed. In the court's view such a temporary § 5674(b) substantive statutory stay authorization operates independent of the 14 day, plus14 day extension, provisions of Rule 65, but must be premised on providing a prompt trial on the preliminary issue of whether the arbitration should proceed.

The § 5674(b) summary trial on the issue if the matter is subject to arbitration will be combined with the preliminary injunction hearing. At this phase of these proceedings the court

16

will not be interpreting the scope or enforceability of the restrictive covenants' content or their claimed unconscionability or application to Mr. Hulstrunk under the circumstances of his old or new job, or information learned or obtained, or present work activities. The focus will be if Mr. Hulstrunk is a Company member; if the Fourth Operating Agreement Section 13.9 applies to him; and if so if the alleged waiver and arbitration condition precedents are to be decided by this court or the JAMS arbitrator.

The order requires the parties to confer and promptly report to the court how much hearing time they need for the Section 5674(b)/ preliminary injunction hearing so the court can promptly set it.

Although many of the issues it asserts appears to overlap with those decided here, the court will still separately determine UltraCell's 8/20/18 Motion To Dismiss. The court notes that Defendant's motion asked the court to consider documents and affidavits beyond the matters asserted in the pleadings. Under Vermont law, this converted the motion into an early motion for summary judgment. *Lueders v. Lueders*, 152 Vt. 171 (1989). Such a conversion of the motion by the court requires notice to the parties of such conversion, and reasonable opportunity to submit additional materials pertinent to the motion, before the court rules. *Hemond v. Frontier Communications, of America, Inc*., 2015 VT 67, ¶ 22; *Fitzgerald v. Congleton*, 155 Vt. 283, 293-294 (1990). Thus  UltraCell is given an additional 14 days to submit additional materials for the motion, and Plaintiff 14 days after any further UltraCell submission or deadline, before the court rules on the motion. Ultracell will have the Rule 6 and 78(a) reply memo filing opportunity after Plaintiff's last submission or the deadline for it, runs. If material issues of fact are found to exist as to the motion for summary judgment issues, trial on such issues is likely to be included in the Section 5674(b)/ preliminary injunction hearing.


IT IS HEREBY ORDERED:


[1] The JAMS Arbitration proceeding between UltraCell and Mr. Hulstrunk is STAYED pending further order from this court. A copy of this order may be given to the JAMS arbitrator.  If the arbitrator refuses to comply with the stay, Mr. Hulstrunk may file appropriate action(s) in courts located in the state where the arbitration is proceeding to seek orders to compel compliance with this order.  To the extent this order is issued under V.R.C.P. 65, it is entered for 14 days, subject to extension. However, this interim order is also issued pursuant to 12 V.S.A. § 5674(b), which stay continues in effect until the described  hearing on the12 V.S.A. § 5674(b) / preliminary injunction stay requests.

[2] To protect UltraCell's interest in potential harm from the delay in arbitration, caused by these proceedings, if it is found to hold a right to require arbitration – while this order is in effect Mr. Hulstrunk is enjoined from disclosing to Nature Tech or third parties any alleged Confidential Information belonging to UltraCell, that would be covered under the UltraCell Operating Agreement. Such temporary injunction does not extend to potential customer contact information that Mr. Hulstrunk had learned or obtained before his employment by UltraCell.

[3] Within 15 days the Parties shall inform the court how much hearing time they will need for a combined 12 V.S.A. § 5674(b) / preliminary injunction hearing to determine if the parties agreed to arbitrate and if so decide preliminary arbitration issues (waiver/ conditions precedent) or order that the arbitrator decide such matters.

[4] The Parties are to exchange witness and exhibit lists two weeks before the hearing. They are encouraged to develop a set of stipulated exhibits where possible, to allow for efficient use of court time. As the hearing is set the court will allocate each party half of the available time for presentation of evidence (direct and cross) and is likely to use a chess clock are similar tool to track time. The Parties are forewarned of the need to organize their time in the presentation of their position.

The present October 12, 2018 hearing date will likely be re-set for the section 5674(b) / preliminary injunction hearing, as at present the court has only allotted 30 minutes of hearing time.

Electronically signed on September 18, 2018 at 10:47 AM pursuant to V.R.E.F. 7(d).

_____
Michael J. Harris
Superior Court Judge